**NORTH BROWARD HOSPITAL DISTRICT, et al., Appellees,**

v.

**Donna E. SHALALA, Secretary, U.S. Department of Health and Human Services, Appellant.**

No. 98–5164.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 8, 1999.

Decided April 27, 1999.

Anne M. Lobell, Attorney, U.S. Department of Justice, argued the cause for appellant. With her on the briefs were Frank W. Hunger, Assistant Attorney General, Wilma A. Lewis, U.S. Attorney, and Anthony J. Steinmeyer, Attorney, U.S. Department of Justice.

Ronald N. Sutter argued the cause and filed the brief for appellees.

Before SILBERMAN, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Congress has authorized Medicare reimbursement at a higher than usual rate to certain large urban hospitals that receive significant state and local funding apart from Medicaid and Medicare revenues. The Secretary of Health and Human Services ("HHS") appeals a decision of the district court rejecting her interpretation of the qualifications for eligibility under this provision. *See North Broward Hosp. Dist. v. Shalala,* 997 F.Supp. 41 (D.D.C. 1998). Finding the statute ambiguous and the Secretary's interpretation reasonable, we reverse.

## I.

In 1983, Congress began to phase out the existing cost-based Medicare reimbursement system, *see* 42 U.S.C. § 1395f(b)(1); *Methodist Hosp. of Sacramento v. Shalala,* 38 F.3d 1225, 1227 (D.C.Cir.1994), and to phase in a "prospective payment" system providing reimbursement according to pre-determined rates based on diagnosis and geographic location. *See* Social Security Amendments of 1983, Pub.L. No. 98–21, § 601, 97 Stat. 65, 149 (1983) (codified as amended at 42 U.S.C. § 1395ww). In 1986, recognizing that special adjustments might be needed for hospitals serving an unusually large number of low-income individuals, Congress crafted provisions implementing

"disproportionate share" adjustments for such hospitals. *See* The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Pub.L. No. 99–272, § 9105, 100 Stat. 82, 158 (1986). These disproportionate share adjustments provide for additional Medicare payments for hospitals that qualify on either of two grounds. Hospitals typically qualify for an adjustment by showing that they serve a disproportionate number of low-income patients based on the proportion of inpatient days attributable to Medicaid patients and to Medicare patients qualifying for Supplemental Security Income benefits.[1] *See* 42 U.S.C. § 1395ww(d)(5)(F)(i)(I), (v), (vi). Alternatively, under the provision at issue in this case, large urban hospitals can qualify by demonstrating that they receive state and local funding which exceeds a statutory threshold. Specifically, the statute provides for a disproportionate share adjustment for any hospital that

> is located in an urban area, has 100 or more beds, and can demonstrate that its net inpatient care revenues (excluding any of such revenues attributable to [Medicare or Medicaid] ), during the cost reporting period in which the discharges occur, for indigent care from State and local government sources exceed 30 percent of its total of such net inpatient care revenues during the period.

*Id.* § 1395ww(d)(5)(F)(i)(II). As originally enacted in 1986, this provision read just as it does now, except that the phrase "total of such net inpatient care revenues" read "total of such revenues." *See* COBRA § 9105(a)(F)(i)(II), 100 Stat. 82, 158. The change to the present wording was made by a 1987 amendment. *See* The Omnibus Budget Reconciliation Act of 1987 (OBRA), Pub.L. No. 100–203, § 4009(j)(3)(A), 101 Stat. 1330, 1330–59 (1987).

The controversy in this case centers on the proper interpretation of the ratio specified in this provision. The single issue is whether the 30% set forth in the provision is a percentage of all net inpatient care revenues or whether it is a percentage of net inpatient revenues *excluding* revenues from Medicare and Medicaid. In other words, the question is whether the antecedent of "total of such net inpatient care revenues" is "net inpatient care revenues" or "net inpatient care revenues (excluding any of such revenues attributable to [Medicare or Medicaid] )."

North Broward Hospital District ("North Broward"), doing business as Broward General Medical Center, North Broward Medical Center, and Imperial Point Medical Center, believed that the latter interpretation was correct, and that its facilities therefore qualified for the disproportionate share adjustment for fiscal years 1989–1991. However, the Medicare fiscal intermediary adhered to the former interpretation, and accordingly refused to make the more generous reimbursements to North Broward. North Broward appealed to the Provider Reimbursement Review Board ("PRRB") as specified in 42 U.S.C. § 1395oo(a), (h). The PRRB adopted the latter interpretation of the ratio, reversed the intermediary's decision, and held that the North Broward facilities qualified for the disproportionate share adjustment. Next, at the urging of the intermediary and HHS's Bureau of Policy Development ("BPD"), the Administrator of the Health Care Financing Administration ("HCFA"), acting as the Secretary's delegate, reversed the Board's decision, as permitted by 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1875. The Administrator held that the provision contained "incontrovertible referential ambiguity" and that the former interpretation, adopted by the BPD and the intermediary, was reasonable. Pursuant to 42 U.S.C. § 1395oo(f)(1), the hospitals sought review in the district court, which in turn reversed the Administrator's decision and granted summary judgment for North Broward. The district court held that the

---

1. Supplemental Security Income furnishes financial assistance to indigent persons who are aged, blind, or disabled. *See* 42 U.S.C. § 1381 *et seq.*

language of the provision is clear and unambiguous and that it requires the latter interpretation, urged by North Broward. 997 F.Supp. at 45, 48. The Secretary appeals from this ruling of the district court.

## II.

The practical differences between the Secretary's interpretation and that advanced by North Broward and accepted by the district court are significant. As an illustration of the implications of the two interpretations, consider an example of a hospital whose total net inpatient care revenues are $100,000,000, of which $40,000,000 are Medicare and Medicaid revenues. Under North Broward's interpretation, which excludes Medicare and Medicaid revenues from the denominator of the ratio, the hospital would qualify for a disproportionate share adjustment under the provision at issue as long as it received more than $18,000,000 in state and local funding not attributable to Medicaid or Medicare, as illustrated by the following calculations:

**North Broward's interpretation**

| Numerator | = | (State and local funding other than Medicare & Medicaid) |
| | = | $18,000,000 |
| Denominator | = | (Net inpatient revenues, excluding Medicare & Medicaid) |
| | = | $100,000,000 – $40,000,000 |
| | = | $60,000,000 |

The ratio is thus $^{18}\!/_{60}$, or 30%.

Under the Secretary's interpretation, which does not exclude Medicare and Medicaid revenues from the denominator, the hospital would need to receive more than $30,000,000 of state and local funding not attributable to Medicaid or Medicare to qualify:

**Secretary's interpretation**

| Numerator | = | (State and local funding other than Medicare & Medicaid) |
| | = | $30,000,000 |
| Denominator | = | (Total net inpatient revenues) |
| | = | $100,000,000 |

The ratio is thus $^{30}\!/_{100}$, or 30%.

Given the sizable difference in the amount of state and local funding required to qualify under the two interpretations, adopting

North Broward's interpretation would likely increase the number of providers qualifying for the disproportionate share adjustment under the provision.[2]

■ Whether such an increase in the provision's applicability would be appropriate or desirable is a matter of policy, not of statutory construction, and within the bounds of congressional directive, it is primarily a question for HHS, not the courts. Because an agency's policy choices are necessarily constrained by the statute pursuant to which it acts, when an agency has interpreted a statute it administers, we first consider whether Congress has "directly addressed the precise question at issue." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If the intent of Congress is clear, it must be given effect. *Id.* However, if the intent of Congress is not clear, we do not impose our own construction of the statute, but instead examine only whether "the agency's answer is based on a permissible construction of the statute." *Id.* Thus, absent clear congressional intent to the contrary, we will defer to the Secretary's interpretation " 'if it is reasonable and consistent with the statute's purpose.' " *National Med. Enters., Inc. v. Shalala,* 43 F.3d 691, 695 (D.C.Cir.1995) (quoting *Chemical Mfrs. Ass'n v. EPA,* 919 F.2d 158, 162–63 (D.C.Cir.1990)). *See also HCA Health Servs. of Oklahoma, Inc. v. Shalala,* 27 F.3d 614, 616–17 (D.C.Cir. 1994); *Marymount Hosp., Inc. v. Shalala,* 19 F.3d 658, 661 (D.C.Cir.1994).

■ North Broward advances two arguments that the usual *Chevron* analysis is inapplicable, neither of which we find convincing. First, North Broward argues that the Secretary's interpretation of the statute creating the ratio is not entitled to deference because it is not longstanding, noting that even the Administrator's decision characterized the regulations as si-

2. According to HHS, fewer than a dozen facilities or hospital districts in the nation qualified under this provision in 1995. Secretary's Brief at 42; J.A. at 65.

lent with respect to the issue. We are somewhat puzzled by North Broward's argument, since the statutory interpretations of the agency's adjudicatory decision in this case would be entitled to deference even if the matter had never been addressed in regulations at all. *See Appalachian Regional Healthcare, Inc. v. Shalala,* 131 F.3d 1050, 1054 (D.C.Cir.1997). There is certainly no argument that the Administrator's decision in this case is actually incompatible with the regulations. While perhaps not entirely unambiguous, the regulations describe the required ratio as 30 percent of "net inpatient care revenues" and are thus more consistent with the Secretary's interpretation of the statute than with the contrary position urged by North Broward. *See* 42 C.F.R. § 412.106(c)(2) (providing that the adjustment is available if a hospital "can demonstrate that, during its cost reporting period, more than 30 percent of its net inpatient care revenues are derived from State and local government payments for care furnished to indigent patients"). *See also* 51 Fed.Reg. 16,772, 16,776 (1986) (explaining that a qualifying hospital must show "that more than 30 percent of its total inpatient care revenues are from State and local government sources and that these revenues are specifically earmarked for the care of indigents").

■ Second, and even less convincingly, North Broward argues that the Secretary is not entitled to deference because of her "unremitting hostility" to disproportionate share adjustments in general. As evidence of this hostility, North Broward notes that Congress's 1986 enactment of statutory disproportionate share adjustments arose in response to HHS's failure to implement acceptable adjustments by regulation, and that the House and Senate reports expressed dissatisfaction with the Secretary's nonresponsiveness. *See* H.R.Rep. No. 99–241, pt. 1, at 15–16 (1985); S.Rep. No. 99–146, at 291 (1985). As further evidence of the Secretary's alleged hostility to disproportionate share

adjustments, North Broward points to cases rejecting the Secretary's interpretation of the statutory provisions governing disproportionate share adjustments based on a high proportion of low-income "patient days." *See, e.g., Cabell Huntington Hosp., Inc. v. Shalala,* 101 F.3d 984 (4th Cir.1996); *Jewish Hosp., Inc. v. Secretary of HHS,* 19 F.3d 270 (6th Cir.1994). Not surprisingly, North Broward cites no support for its suggestion that we should deny an agency *Chevron* deference because of our judicial assessment that it has been "hostile" to certain ideas. If an agency's "hostility" leads it to adopt an unreasonable interpretation of a statute, the interpretation will, if challenged, be rejected by the courts, as is perhaps illustrated by the cases cited by North Broward in which courts have rejected the Secretary's interpretation of the "patient-day" based disproportionate share mechanism. It is a far different thing to suggest that a court withhold deference to an agency's interpretation of a statute it administers on the basis of some sort of judicial "vote of no confidence" regarding the agency's actions on related matters. If Congress views HHS as "unremittingly hostile" to disproportionate share adjustments, it is free to decrease the agency's discretion in administering them or remove them from the agency's purview entirely. Absent such congressional intervention, administration of the provision at issue is entrusted to HHS, and our review is that prescribed by *Chevron.*

■ Finally, North Broward urges that even if *Chevron* applies, we need not conduct a *Chevron* analysis, because regardless of our view of the statute, the final decision by the HCFA Administrator was arbitrary and capricious and therefore violated the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(A); *see also* 42 U.S.C. § 1395oo(d) & (f)(1). In particular, North Broward relies on the fact that the Administrator's decision made reference to the fact that the phrase "such revenues" appears twice in the relevant

sentence of the statute. North Broward accurately points out that while "such revenues" appeared twice in the statute before the 1987 amendment, it no longer does so—"such revenues" appears once, and "such net inpatient care revenues" appears once. Thus, appellees argue, the Administrator "did not even get the words of the statute right." North Broward Brief at 33. We find this argument hypertechnical. The Administrator's decision quoted the entire relevant statutory passage in two places, one immediately above the complained-of references to "such revenues." The statute was set forth correctly, with "such revenues" in one place and "such net inpatient care revenues" in the other. In light of this, it seems clear that the Administrator's reference to the two occurrences of "such revenues" was simply a shortening of the latter phrase by omitting the modifiers for ease of reference. Such shorthand may offend certain attorneys and copyeditors, but does not offend the APA. We therefore proceed to a *Chevron* analysis.

### III.

█ Under the first step of *Chevron*, our task is to consider whether "the intent of Congress is clear" with respect to the interpretation of the state and local funding provision. *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778. As we noted above, the statute provides for enhanced reimbursement if a hospital

> is located in an urban area, has 100 or more beds, and can demonstrate that its net inpatient care revenues (excluding any of such revenues attributable to [Medicare or Medicaid] ), during the cost reporting period in which the discharges occur, for indigent care from State and local government sources exceed 30 percent of its total of such net inpatient care revenues during the period.

42 U.S.C. § 1395ww(d)(5)(F)(i)(II). The Secretary argues that the statute is inherently ambiguous, in that "total of such net inpatient care revenues" might refer back to simply the entire category of "net inpatient care revenues" or might instead include the modifying parenthetical "(excluding any of such revenues attributable to [Medicare or Medicaid] )." In contrast, North Broward argues that the statute is unambiguous, and that the Secretary's interpretation conflicts with the text of the statute. According to North Broward, by interpreting "total of such net inpatient care revenues" as identical with "net inpatient care revenues," the Secretary's interpretation fails to give effect to the words "of such."

North Broward's argument implicitly assumes that "such" is surplusage if it is not serving some limiting or particularizing role. The district court adopted a similar view. Relying on a portion of the definition of "such" from Black's Law Dictionary, which notes that "such" "represents the object as already particularized in terms which are not mentioned, and is a descriptive and relative word, referring to the last antecedent," *Black's Law Dictionary* 1432 (6th ed.1990), the court concluded that "net inpatient care revenues (excluding any of such revenues attributable to [Medicare] or [Medicaid] )" was the last antecedent, since the parenthetical phrase "particularizes" the object. *North Broward*, 997 F.Supp. at 45. In our view, this analysis takes too narrow a view of the uses of the word "such." While it often serves the particularizing role envisioned by North Broward and the district court, the word "such" can also be used simply to refer back to something previously mentioned but not "particularized." As the Secretary notes, this use of "such" does not render the word surplusage—it still serves a role in "helping the reader to identify concepts that have already been employed in a long or complicated piece of writing." Secretary's Reply Brief at 18.

█ Where both a "particularizing" and a "non-particularizing" interpretation of "such" are possible, it need not be the case that the particularizing interpretation prevails. For example, in *Hogar Agua y*

*Vida en el Desierto, Inc. v. Suarez–Medina*, 36 F.3d 177 (1st Cir.1994), the court encountered a provision whose prefatory clause made the provision applicable to any "single-family house sold or rented by an owner," and whose following provisos referred to "such single-family houses." Although it was argued that the phrase in the provisos unambiguously related back to the complete phrase—"single-family house sold or rented by an owner," rather than to single-family houses generally, the court found the language ambiguous. *Id.* at 185–86. Accordingly, the court construed the statute in accordance with its remedial goals, and held that the references to "such single-family houses" did not incorporate the phrase "sold or rented by an owner," but rather simply referred to any single-family houses. *Id.* at 186.

*United States v. Bowen*, 100 U.S. (10 Otto) 508, 15 Ct.Cl. 619, 25 L.Ed. 631 (1879), upon which North Broward relies, is not to the contrary. In that case, the Supreme Court read the statutory phrase "all such pensioners" not to refer to all pensioners, but to a subset of pensioners previously described, noting that the alternate interpretation would render "such" useless. *Id.*, 100 U.S. (10 Otto) at 512. However, *Bowen* differs from the present situation in important respects. First, the provision considered in *Bowen* had not previously referred to the class of pensioners generally, but had *only* referred to a certain subset. Thus, the Court noted that "[t]here is no antecedent use of the word 'pensioners' in the [relevant] chapter ... to which the word *such* can refer, but the immediately preceding sentence in the same section." *Id.* Accordingly, "such" either had to refer back to the subset, or to nothing. That is not the case here. Second, the *Bowen* Court's task was not the same as ours. The *Bowen* Court had simply to choose between two interpretations of the statute. We must decide whether there is a clear congressional intent which precludes the Secretary's view. *Bowen* did not involve the rejection of the interpretation of those charged with ad-

ministering the statute. Not only did *Bowen* long predate *Chevron*, but, as the pensioners there pointed out, the interpretation of the provision ultimately chosen by the Court had apparently been "uniformly given to it by the Commissioner of Pensions," who was charged with the duty of executing the statute. *Id.*, 100 U.S. (10 Otto) at 511.

Given a choice between attributing to "such" the simple referential function described by the Secretary or a particularizing function, we might ordinarily be inclined to choose the latter, which arguably gives "such" a more meaningful role. However, the provision at issue does not unambiguously require such an interpretation, and indeed, other features of the provision make the Secretary's interpretation of "such" seem more than reasonable. First, the denominator refers not simply to "such net inpatient care revenues" but to the "total of such net inpatient care revenues." North Broward correctly observes that if "such net inpatient care revenues" incorporated the exclusion of Medicare and Medicaid revenues, then "total of such net inpatient care revenues" would as well. Nonetheless, we find the presence of the phrase "total of" at least suggestive that the phrase following is to be all-encompassing, without exclusions. Indeed, this seems the only way to give any real function to the phrase "total of."

In addition, the syntactical structure of the phrase describing the numerator makes it unusually difficult to isolate the antecedent of "such net inpatient care revenues" in the denominator. Even if we were intent on interpreting this phrase as referring to "net inpatient care revenues" as previously particularized, it would not be a simple task. This is so because the reference to "net inpatient care revenues" in the numerator is particularized not only by the parenthetical excluding Medicare and Medicaid revenues, but by two additional phrases as well. The numerator consists of "net inpatient care revenues

(excluding any of such revenues attributable to [Medicare or Medicaid]), during the cost reporting period in which the discharges occur, for indigent care from State and local government sources." 42 U.S.C. § 1395ww(d)(5)(F)(i)(II). North Broward makes sensible arguments explaining why the last two phrases cannot reasonably be read as being within the particularization incorporated by the "such" in the denominator, and we do not suggest that they are. But this reasoning necessarily departs from a simple rule that "such" always incorporates previous particularizations, and illustrates that the unwieldy formulation of the numerator makes blanket application of such a rule unworkable here. Given this, it is impossible to conclude that Congress clearly intended that "such" serve the specific particularizing role advanced by North Broward.

The Secretary argues that her interpretation is also bolstered by consideration of the provision's original wording and the change made by the 1987 amendment. The sole modification to the provision made by the 1987 Act was to replace the requirement that the numerator "exceed 30 percent of [the hospital's] total of such revenues" with a requirement that the numerator "exceed 30 percent of [the hospital's] total of such net inpatient care revenues." *See* OBRA § 4009(j)(3)(A), 101 Stat. 1330, 1330–59. According to the Secretary, the 1987 change was merely intended to clarify that the phrase "total of such revenues" was not meant to indicate gross revenues rather than net. In the Secretary's view, this is supported by a string of words from the Conference Report accompanying the 1987 amendment (calling it a sentence would be too kind):

> [T]here has been controversy over the interpretation of current statutory language which refers to inpatient care revenues as "net inpatient care revenues" in one location, but refers to "such revenues" has been interpreted to mean either gross inpatient revenues (revenues the hospital would receive if all patients paid the hospital's full charges) or net inpatient revenues (gross revenues minus bad debts, contractual allowances, and charity care).

H.R. Conf. Rep. No. 100–495, at 543 (1987). While impossible to parse grammatically, this is the only passage in the legislative history to which we have been referred which meaningfully attempts to explain the motivation for the 1987 amendment. It provides at least minimal support for the Secretary's view of the purpose of that amendment.

Whether or not the 1987 amendment was made only to clarify the net versus gross issue, it was styled a "technical correction," *see* OBRA § 4009(j)(3)(A), 101 Stat. 1330, 1330–59, suggesting that only clarification and not substantive change was intended. Thus our concern is the meaning of the phrase "such revenues" as used in describing the denominator of the ratio in the original 1986 enactment, and as "clarified" in 1987 to read "such net inpatient care revenues."

As originally enacted, the provision provided an adjustment for any hospital that could

> demonstrate that its *net inpatient care revenues* (excluding any of *such revenues* attributable to [Medicare or Medicaid]), during the cost reporting period in which the discharges occur, for indigent care from State and local government sources exceed 30 percent of its total of *such revenues* during the period.

COBRA § 9105(a)(F)(i)(II), 100 Stat. 82, 158 (emphasis added). The first occurrence of "such revenues" in this passage unambiguously referred back to "net inpatient care revenues." In the Secretary's view, the second occurrence of "such revenues" had the same meaning as the first, referring back simply to "net inpatient care revenues," and since the 1987 amendment did not implement any substantive change, the current "such net inpatient care revenues" language in the denominator has the same meaning. While we cannot assume that the antecedent of the

second occurrence of "such revenues" would necessarily have to be the same as that of the first, we agree that the previous occurrence of "such revenues" with a clear antecedent does seem to provide at least some support for construing the latter occurrence of "such revenues" (and thus the amended "such net inpatient care revenues") as referring to the same antecedent.

The Secretary also asserts that her interpretation of the statute is the only one compatible with the legislative history of the original act, which indicated that the adjustment applied to a hospital if "at least 30% of its net inpatient care revenue is provided by local or state governments for inpatient care for low-income patients not otherwise reimbursed by medicaid." H.R.Rep. No. 99–241, pt. 1, at 16. The House Report also states that "[t]he Committee further intends that *the denominator of this equation, net inpatient care revenue*, be defined according to the generally accepted accounting principles in the hospital industry; i.e., this factor should represent gross patient care revenues less deductions from revenue (other than contractual allowances), as those terms are generally used." *Id.* at 18–19 (emphasis added). We agree that these passages are consistent with the Secretary's view that the relevant state and local funding was required to be 30% or more of *total* net inpatient care revenues. The Conference Report further supports the Secretary's view, describing hospitals qualifying under this provision as "those which can demonstrate that more than 30 percent of their revenues are derived from State and local government payments for indigent care provided to patients not covered by medicare or medicaid." H.R. Conf. Rep. No. 99–453, at 461–62 (1985).

■ However, North Broward argues that since the present wording of the provision dates only from the 1987 amendment, the legislative history of that amendment, and not that of the original enactment, is the better source for deter-mining Congress's intent. North Broward notes that in discussing "present law," the 1987 Conference Report noted that a hospital qualified under the provision at issue if "it can demonstrate that more than 30 percent of its inpatient care revenues (excluding any Medicare or Medicaid revenues) are provided by State and local government · payments for indigent care." H.R. Conf. Rep. No. 100–495, at 543. The Conference Report further noted that the amendment "[c]larifies that a hospital would qualify if more than 30 percent of its net inpatient care revenues (excluding any Medicare or medicaid revenues) are provided by State and local government payments for indigent care." *Id.* at 545. The Secretary argues, and we agree, that the 1987 Conference Report's characterization of existing law is entitled to little weight. As the Supreme Court has observed, subsequent legislative history is "an unreliable guide to legislative intent." *Chapman v. United States*, 500 U.S. 453, 464 n. 4, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). *See also Wright v. West*, 505 U.S. 277, 295 n. 9, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); *Pierce v. Underwood*, 487 U.S. 552, 566–67, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). However, North Broward argues that because the 1987 legislative history accompanied an amendment to the provision at issue, its view of existing law deserves credit. While a discussion of existing law in subsequent legislative history may be more valuable where it accompanies a related amendment to the provision, *see Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 840, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988); *United States v. General Motors Corp.*, 518 F.2d 420, 436–37 (D.C.Cir.1975), here there is no evidence that the exclusion of Medicare and Medicaid funds from the denominator of the ratio was the focus of attention of Congress, the Conference Committee, or even the author of the report. Hence the passages in the Conference Report on which North Broward relies as evidencing whether Medicare and Medicaid were intended to be excluded from the denomina-

tor are mere "legislative dicta," *Dunn v. Commodity Futures Trading Comm'n,* 519 U.S. 465, 478, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997), and we do not view these remarks as speaking meaningfully to this issue.

Furthermore, even if we were inclined to give weight to the 1987 Conference Report, which we are not, it is not at all clear that the report, taken as a whole, supports North Broward's position. To be sure, in the passage cited by North Broward, the Conference Report characterizes existing law as providing an adjustment if a hospital can demonstrate "that more than 30 percent of its inpatient care revenues (excluding any Medicare or Medicaid revenues) are provided by State and local government payments for indigent care." Because of the placement of the parenthetical after "revenues" rather than at the end of the sentence, this portion of the history is consistent with North Broward's interpretation. However, elsewhere in the same Conference Report, there is language encouraging the Secretary "expeditiously to implement the disproportionate share adjustment for hospitals which receive more than thirty percent of net patient revenues from State and local governmental sources," H.R. Conf. Rep. No. 100–495, at 525 (1987), and setting the amount of the adjustment at 15% for hospitals "which receive at least 30 percent of their net inpatient care revenues from State and local payments for indigent care," *id.* at 521. Because these portions of the report refer to the required ratio as 30% of net revenues with no reference to excluding Medicare and Medicaid, they do not support North Broward's interpretation. Thus, in our view, the only lesson to be drawn from the 1987 legislative history is that the individuals who wrote it had not carefully considered, or at least didn't quite agree on, what the original provision meant.

In sum, the provision's textual unwieldiness is not illuminated by this jumbled legislative history, and we cannot discern any clear congressional intent regarding the meaning of the provision. Accordingly, we agree with the Secretary that the provision is ambiguous, and proceed to the second step of the *Chevron* analysis.

### IV.

We have little difficulty concluding that the Secretary's interpretation is a permissible construction of the provision. Indeed, the ambiguity of the provision described above arises largely because the provision is reasonably amenable to both the Secretary's and North Broward's readings. Nonetheless, North Broward argues that even if the Secretary's interpretation is a possible parsing of the provision's text, it is unreasonable in that it effectively penalizes hospitals for treating Medicare and Medicaid patients. This is so, the argument goes, because under the Secretary's interpretation, the more services a hospital furnishes to Medicare and Medicaid patients, the lower its ratio will be, since revenues for those services will be included in the denominator, but not the numerator. In contrast, North Broward suggests that under its interpretation, services to Medicare and Medicaid patients "do not help a hospital qualify for a disproportionate share adjustment ... but neither do they hurt the hospital." North Broward Brief at 39.

We find North Broward's argument unconvincing. First, even if increased Medicare and Medicaid funding adversely affected a hospital's ratio under *this* provision, hospitals treating an unusually large number of Medicaid and low-income Medicare patients are entitled to the disproportionate share adjustment under the alternate mechanism of 42 U.S.C. § 1395ww(d)(5)(F)(i)(I), (v), (vi). The provision at issue in this case seeks to identify and appropriately compensate hospitals receiving significant state and local funding for indigent care *apart from* Medicaid and Medicare spending. To the extent that an increase in Medicaid and Medicare revenues decreases the proportion of

revenues attributable to other state and local funding, a decrease in the hospital's ratio could well be what Congress had in mind.

More importantly, we are unconvinced of North Broward's factual premise—at least in some circumstances, it is the Secretary's interpretation, and not North Broward's, that is neutral with regard to services to Medicare and Medicaid patients. For example, suppose that in a given year, Hospital A and Hospital B each had total net inpatient care revenues of $100,000,-000, of which $20,000,000 was state and local funding not attributable to Medicare or Medicaid. Suppose, however, that Hospital A received $40,000,000 net inpatient care revenues from Medicare and Medicaid, and $40,000,000 from other sources such as private insurance and individual payments, while Hospital B received $50,-000,000 from Medicare and Medicaid and $30,000,000 from other sources. Thus, the only difference in the two hospitals' revenues is the amount of funding from Medicare and Medicaid versus private sources. The ratios calculated under this provision would be as follows:

**Secretary's interpretation**

| Hospital A: | Numerator | = | $20,000,000 state and local funding |
| | Denominator | = | $100,000,000 total |
| | Ratio | = | 20/100 |
| Hospital B: | Numerator | = | $20,000,000 state and local funding |
| | Denominator | = | $100,000,000 total |
| | Ratio | = | 20/100 |

**North Broward's interpretation**

| Hospital A: | Numerator | = | $20,000,000 state and local funding |
| | Denominator | = | $100,000,000 total − $40,000.00 Medicare & Medicaid |
| | | = | $60,000,000 |
| | Ratio | = | 20/60 |
| Hospital B: | Numerator | = | $20,000,000 state and local funding |
| | Denominator | = | $100,000,000 total − $50,000,000 Medicare & Medicaid |
| | | = | $50,000,000 |
| | Ratio | = | 20/50 |

Under the Secretary's method, the fact that Hospital B had more services funded by Medicare and Medicaid than Hospital A

leads to no difference in the ratios for the two hospitals. Under North Broward's method, however, Hospital B's greater Medicare and Medicaid funding leads to a higher ratio. We do not understand why North Broward views this as "neutral."

Furthermore, in some situations, this feature of North Broward's interpretation would lead to results which seem less consistent with the apparent purpose of the provision than would be the case under the Secretary's interpretation. For example, consider two otherwise qualifying hospitals, C and D, each of which has total net inpatient care revenues of $100,000,000, of which $10,000,000 is from Medicaid. Suppose that Hospital C receives heavy state and local funding not attributable to Medicaid or Medicare, in the amount of $23,-000,000, while Hospital D receives $10,-000,000 in such funds. One would expect that if either hospital would qualify for a disproportionate share adjustment under the provision targeted at hospitals with unusually high state and local funding, it would be Hospital C. However, under North Broward's interpretation, as we understand it, this would not necessarily be the case. In particular, suppose that Hospital D is in an area with a large number of retirees, and therefore has a large amount of Medicare revenues totaling $60,000,000, while Hospital C has Medicare revenues of only $10,000,000. The calculations under North Broward's method would proceed as follows:

| Hospital C: | Numerator | = | $23,000,000 |
| | Denominator | = | $100,000,000 − $10,000,000 Medicaid − $10,000,000 Medicare |
| | | = | $80,000,000 |

The ratio is thus $23/80$, which is less than 30%.

| Hospital D: | Numerator | = | $10,000,000 |
| | Denominator | = | $100,000,000 − $10,000,000 Medicaid − $60,000,000 Medicare |
| | | = | $30,000,000 |

The ratio is thus $10/30$ = 1/3, which is greater than 30%.

Thus despite its far greater state and local funding, Hospital C would not qualify for the adjustment under North Broward's interpretation, while Hospital D would. We note that the difference in Medicare funding that tips the balance in favor of Hospital D need not be for indigent elderly at all, but could equally as well be for wealthy seniors with Winnebagos and supplemental insurance. It is hard to see why serving a high number of such patients should affect Hospital D's ratio so favorably. We see little logic in this feature of North Broward's interpretation, and cannot condemn the Secretary's failure to adopt it.

For the foregoing reasons, the decision of the district court is

*Reversed.*