UNIVERSITY MEDICAL CENTER
OF SOUTHERN NEVADA,
Plaintiff–Appellant,

v.

Tommy G. THOMPSON, Secretary United States Department of Health and Human Services, Defendant–Appellee.

No. 02–17278.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 2004.

Filed Aug. 20, 2004.

Edith S. Marshall, Powers, Pyles, Sutter & Verville, P.C., Washington, DC, Stewart

L. Bell, Janet F. Stewart, Mark E. Wood, Office of the District Attorney, Las Vegas, NV., for the appellant.

Robert D. McCallum, Jr., Daniel G. Bogden, Anthony J. Steinmeyer, Anne Murphy, Department of Justice, Civil Division, Washington, DC, for the appellee.

Before: TASHIMA and CLIFTON, Circuit Judges, and LEIGHTON,* District Judge.

LEIGHTON, District Judge:

University Medical Center of Southern Nevada ("UMC") appeals a decision of the district court rejecting its interpretation of the qualifications for a "disproportionate share adjustment" under that portion of the Medicare statute authorizing additional payments to hospitals serving disproportionate numbers of low-income patients.

## I. Facts and Procedural History

Medicare provides health insurance benefits to participating individuals over the age of sixty-five, qualifying disabled individuals and those suffering from end-stage renal disease. 42 U.S.C. § 1395c. Until 1983, Medicare reimbursed health care providers for the reasonable cost of their services—which, in most instances, meant their actual cost so long as it did not exceed certain limits. *Id.* §§ 1395f(b)(1), 1395x(v). Beginning in 1983, Medicare began reimbursing hospitals according to predetermined rates based on diagnosis and geographic location. *Id.* § 1395ww(d). Although Congress intended this change to promote efficiency and cost-effectiveness, Congress

recognized that certain adjustments might be required for those hospitals with actual costs that regularly exceeded the new rates. H.R. REP. NO. 98–25, at 132 (1983), U.S.Code Cong. & Admin.News 1983, pp. 219, 351. Congress explained that urban hospitals serving a disproportionately high number of low income patients can be disadvantaged by the diagnosis-based rates because such patients "may be more severely ill than average." *Id.* at 141, U.S.Code Cong. & Admin.News 1983, pp. 219, 360. The resulting "disproportionate share adjustment" allows these hospitals to qualify for additional payments to better ensure that they are properly compensated for their services. 42 U.S.C. § 1395ww(d)(5)(F).

Congress ultimately established two methods by which hospitals can qualify for additional payments. The method at issue in this case, the so-called "Pickle Method," authorizes additional payments to hospitals serving disproportionately higher numbers of indigent patients as determined by comparing revenue from non-federal, state and local sources with revenue from all sources. 42 U.S.C. § 1395ww(d)(5)(F)(i)(II). As originally enacted, the Pickle Method provided an adjustment for any hospital that:

> is located in an urban area, has 100 or more beds, and can demonstrate that its net inpatient care revenues (excluding any of such revenues attributable to [Medicare or Medicaid]) ... for indigent care from State and local government sources exceed 30 percent of its total of such revenues during the period.

Comprehensive Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–272 § 9105(a)(F)(i)(II), 100 Stat. 82, 158 (1986)

---

* Honorable Ronald B. Leighton, United States District Judge for the Western District of     Washington, sitting by designation.

(codified as amended at 42 U.S.C. § 1395ww(d)(5)(F)).

Congress amended this statutory language one year later. As amended, the statute authorizes an adjustment for any hospital that:

is located in an urban area, has 100 or more beds, and can demonstrate that its net inpatient care revenues (excluding any of such revenues attributable to [Medicare or Medicaid]) ... for indigent care from State and local government sources exceed 30 percent of its total of such net inpatient care revenues during the period.

Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203 § 40009(j)(3)(A), 101 Stat. 1330, 1130–59 (1987). In so doing, Congress replaced the phrase "total of such revenues" with the phrase "total of such net inpatient care revenues." Congress appears to have intended to clarify that a hospital's care of indigent patients is measured against net revenue—i.e., gross revenue ("revenues the hospital would receive if all patients paid the hospital's full charges") less certain specific deductions ("bad debts, contractual allowances and charity care"). H.R. CONF. REP. NO. 100–495, at 543 (1987), U.S.Code Cong. & Admin.News 1987, pp. 2313-1245, 2313-1289.

A hospital seeking reimbursement from Medicare submits a cost report to a "fiscal intermediary," an entity with which the Secretary of Health and Human Services ("Secretary") contracts for purposes of performing audit and payment functions under Medicare. 42 U.S.C. § 1395h; 42 C.F.R. §§ 413.20(b), 413.24(f). The fiscal intermediary audits the report and then informs the hospital of its calculation of the appropriate Medicare reimbursement to which the hospital is entitled. 42 C.F.R. § 405.1803.

A hospital that is dissatisfied with this decision may file an appeal with the Provider Reimbursement Review Board ("PRRB"), an administrative tribunal appointed by the Secretary. 42 U.S.C. §§ 1395oo(a), (h). The PRRB's decision constitutes a final administrative decision unless it is reversed, affirmed or modified by the Secretary. *Id.* § 1395oo(f)(1). A hospital that is dissatisfied with the decision of the PRRB may obtain judicial review. *Id.*

UMC's fiscal intermediary denied a disproportionate share adjustment under the Pickle Method for each of the fiscal years 1993, 1994 and 1995. UMC disagreed with the decision and appealed to the PRRB. The sole issue before the PRRB was whether, for purposes of qualifying for an adjustment under the Pickle Method, the extent to which a hospital cares for low-income patients is measured against net inpatient care revenues *as a whole* or net inpatient care revenues *less Medicare and Medicaid payments*. The PRRB adopted the former interpretation—meaning that to qualify, UMC would be required to show that more than thirty percent of its net inpatient care revenues (including Medicare and Medicaid payments) is obtained from non-federal, state and local sources. In reaching this decision, the PRRB relied upon *North Broward Hosp. Dist. v. Shalala*, 172 F.3d 90 (D.C.Cir.), *cert. denied*, 528 U.S. 1022, 120 S.Ct. 532, 145 L.Ed.2d 413 (1999), a case involving the same issue of statutory interpretation.

UMC sought review in the United States District Court for the District of Nevada. The district court likewise agreed with *North Broward* and affirmed the PRRB's decision. UMC thereafter appealed to this Court.

The technical question of statutory interpretation raised by UMC is whether the word "such" in the phrase "such net inpatient care revenues" refers back to "net inpatient care revenues (excluding any of

such revenues attributable to [Medicare or Medicaid])" or simply to "net inpatient care revenues." UMC contends that the adjective "such" typically refers to a particular antecedent—in this case, "net inpatient care revenues (excluding any of such revenues attributable to [Medicare or Medicaid])." The Secretary counters that the adjective "such" occasionally refers to a general antecedent—in this case, "net inpatient care revenues." The Secretary argues that, in the context of this statute, the word "such" necessarily refers to a general antecedent because it is immediately preceded by the noun "total"—a word that implies an aggregation of the earlier-described net inpatient care revenues.

## II.  Discussion

■ When asked to review the propriety of an agency's interpretation of a statute, a federal court is faced with two questions:

> First ... is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). This Court must determine, in the first instance, whether Congress clearly intended to exclude Medicare and Medic-

aid payments from net inpatient care revenues. If the statute does not evidence such an intention, the Court must then determine whether the Secretary's contrary interpretation (that such payments should be included in net inpatient care revenues) reflects a permissible construction of the statute. If the Secretary's interpretation reflects such a construction, then it is entitled to deference. *American Rivers v. FERC,* 201 F.3d 1186, 1194 (9th Cir.2000).

### A.

■ UMC argues that the statute clearly requires the exclusion of Medicare and Medicaid payments from net inpatient care revenues. Specifically, UMC argues that the word "such" unambiguously refers back to the particular antecedent "net inpatient care revenue (excluding any such revenue from [Medicare or Medicaid])." This argument is not supported by the statutory language, however.

UMC ignores the noun "total" immediately preceding the word "such" in the statutory provision—thereby violating the principle that every word in a statute must be given effect whenever possible. *See, e.g., TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). The word "total," when used as a noun, means "quantity or amount reached by addition." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 1220 (1994). In the context of this statute, the word "total" implies that the word "such" refers to aggregate net inpatient care revenues, and that the Medicare and Medicaid payments that were previously deducted from net inpatient care revenues for purposes of determining a hospital's revenue from non-federal sources should now be added back for purposes of determining a hospital's revenue from all sources.

UMC's interpretation would be correct—and the statute would unambiguously support its interpretation—if the words "its total of" were deleted and the statute read "30 percent of such net inpatient care revenues." In this circumstance, the antecedent would be unmistakable. That UMC must delete three words to advance its interpretation, however, undermines its contention that the statute is clear.

Moreover, UMC overstates the extent to which the word "such" necessarily refers to a particularized antecedent. Where "a 'particularizing' and a 'non-particularizing' interpretation of 'such' are possible, it need not be the case that the particularizing interpretation prevails." *North Broward*, 172 F.3d at 95. This exception has particular application in the context of this case. As the D.C. Circuit explained:

> Given a choice between attributing to "such" the simple referential function ... or a particularizing function, we might ordinarily be inclined to choose the latter.... However, the provision at issue does not unambiguously require such an interpretation. ... [W]e find the presence of the phrase "total of" at least suggestive that the phrase following is to be all-encompassing, without exclusions. Indeed, this seems the only way to give any real function to the phrase "total of."

*Id.* at 96. This Court agrees: the word "such" does not clearly refer back to the particular antecedent "net inpatient care revenue (excluding any such revenue from [Medicare or Medicaid])" and may well refer back to the general antecedent "net inpatient care revenue."

Finally, UMC misstates the impact of the Secretary's interpretation. UMC contends that, because Medicare is a wholly federally-funded program, Medicare payments are already excluded from a hospital's revenue from state and local sources. From this, UMC concludes that the paren-thetical exclusion of Medicare and Medicaid payments must apply to aggregate net inpatient revenues, as this is the only category of revenues mentioned in the statute from which Medicare payments can be excluded. Congress, however, appears to have considered the possibility that Medicare funds might be used to underwrite indigent care at the local level. A House Conference Report describes qualifying hospitals as those that can "demonstrate that more than 30% of their revenues are derived from State and local government payments for indigent care provided to patients not covered by medicare or medicaid." H.R. CONF. REP. NO. 99–453, at 461–62 (1985) (discussed in 131 CONG. REC. H13093–02 (1985)). This suggests that Congress consciously inserted the word Medicare in the parenthetical to eliminate any possibility that federal funds would be included in the determination of a hospital's revenues from local sources.

### B.

■ When Congress' intent cannot be clearly discerned from the statutory language, courts must defer to an agency's interpretation so long as it is "based on a permissible construction of the statute." *Pacheco–Camacho v. Hood*, 272 F.3d 1266, 1268 (9th Cir.2001), *cert. denied*, 535 U.S. 1105, 122 S.Ct. 2313, 152 L.Ed.2d 1067 (2002) (quoting *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778). In this case, the Secretary's interpretation is entirely permissible. The phrase "net inpatient care revenues" can be interpreted as aggregate net inpatient revenues without regard to source. The presence of the noun "total" preceding the word "such" strongly implies that "such" refers back to aggregate net inpatient care revenues from whatever source, and that the Medicare and Medicaid payments that were previously deducted from net inpatient care revenues to determine revenue from state and local

sources should now be added back to determine aggregate revenue.

The Secretary's interpretation is also permissible given the legislative history of the statute, both as enacted in 1986 and as amended in 1987. The legislative history surrounding the original enactment universally supports the Secretary's interpretation. The House Report states that additional payments would be available to a hospital if "at least 30% of its net inpatient care revenue is provided by local or state governments for inpatient care for low-income patients not otherwise reimbursed by medicaid." H.R. REP. NO. 99–241, at 16 (1985), U.S.Code Cong. & Admin.News 1986, pp. 579, 594. In addition, it states that:

> The Committee further intends that the denominator of this equation, net inpatient care revenue, be defined according to the generally accepted accounting principles in the hospital industry; i.e., this factor should represent gross patient care revenues less deductions from revenue (other than contractual allowances), as those terms are generally used.

*Id.* at 18–19, U.S.Code Cong. & Admin.News 1986, pp. 579, 596–597. These statements fully support the Secretary's interpretation that the relevant state and local funding must exceed 30% of total net inpatient care revenue, without any deduction for Medicare and Medicaid.

The legislative history surrounding the 1987 amendment is more equivocal. UMC emphasizes the House Conference Report which states, in a discussion of "current law," that a hospital qualifies for an adjustment if it "can demonstrate that more than 30 percent of its inpatient care revenues (excluding any Medicare or Medicaid revenues) are provided by State and local government payments for indigent care." H.R. CONF. REP. NO. 100–495, at 543 (1987), U.S.Code Cong. & Admin.News

1987, pp. 2313-1245, 2313-1289. The Conference Report further states that the amendment clarifies "that a hospital would qualify if more than 30 percent of its net inpatient care revenues (excluding any Medicare or medicaid revenues) are provided by State and local government payments for indigent care." *Id.* at 545, U.S.Code Cong. & Admin.News 1987, pp. 2313-1245, 2313-1291. Although these statements support UMC's position, they are not dispositive.

First, subsequent legislative history is "an unreliable guide to legislative intent." *Chapman v. United States,* 500 U.S. 453, 464 n. 4, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). This is particularly the case when, as here, the discussion of existing law does not accompany a related amendment to the pertinent statutory provision. *Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 840, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988). As the D.C. Circuit explained: "here there is no evidence that the exclusion of Medicare and Medicaid funds ... was the focus of attention of Congress, the Conference Committee or even the author of the report"—suggesting that these statements were either mistaken or misinformed. *North Broward,* 172 F.3d at 98.

Second, the statements supporting UMC's position are offset by an equal number of statements supporting the Secretary's interpretation. The Conference Report criticizes the Secretary for failing to implement the disproportionate share "for hospitals which receive more than thirty percent of net patient revenues from State and local governmental sources," H.R. CONF. REP. NO. 100–495, at 525 (1987), U.S.Code Cong. & Admin.News 1987, pp. 2313-1245, 2313-1270, and establishes the amount of the adjustment at 15% for those hospitals "which receive at least 30 percent of their net inpatient care

revenues from State and local payments for indigent care." *Id.* at 521, U.S.Code Cong. & Admin.News 1987, pp. 2313-1245, 2313-1266. These statements refer to net inpatient revenue without any express reduction for Medicare and Medicaid. As the D.C. Circuit concluded: "in our view, the only lesson to be drawn from the 1987 legislative history is that the individuals who wrote it had not carefully considered, or at least didn't quite agree on, what the original provision meant." *North Broward*, 172 F.3d at 99. This Court agrees with the D.C. Circuit's conclusion regarding the import of this legislative history.

Because the Secretary's interpretation reflects a permissible construction of the statutory language, it is entitled to deference. The district court properly followed *North Broward* and correctly entered judgment in favor of the Secretary.

**AFFIRMED.**