KINGMAN PARK CIVIC ASSOCIATION, et al., Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants.

No. CIV.A. 98–0758(CKK).

United States District Court, District of Columbia.

Aug. 31, 1999.

Howard Irving Fox, Earth Justice Legal Defense Fund, Ocean Law Project, Washington, DC, for plaintiffs.

Scott J. Jordan, United States Department of Justice, Environmental Defense Section, Washington, DC, Meredith Manning, United States Attorney's Office, Washington, DC, Stephania Shamet, Environmental Protection Agency, Philadelphia, PA, CarolAnn Siciliano, United States Environmental Protection Agency, Office of General Counsel, Washington, DC, for defendants.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

Over twenty-five years ago, Congress enacted the Federal Water Pollution Control Act Amendments of 1972, an ambitious and comprehensive statute designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's

waters." Pub.L. No. 92 500, § 101(a), 86 Stat. 816, 816 (codified as amended at 33 U.S.C. § 1251(a)). The 1972 Amendments were updated in the Clean Water Act of 1977 ("CWA"), Pub.L. No. 95–217, 91 Stat. 1566 (codified as amended at 33 U.S.C. §§ 1251 *et seq.*). Among the innovations that Congress introduced in the CWA was a mandate compelling states to establish for each of their most polluted waterways a Total Maximum Daily Load ("TMDL"), a measurement intended to regulate the discharge of pollutants into those bodies of water. *See* CWA § 303(d)(1), 33 U.S.C. § 1313(d)(1). The CWA required each state, including the District of Columbia, to submit by June 28, 1979 (no more than 180 days after the EPA identified certain pollutants. pursuant to § 1314(a)(2)(D)) the first of its TMDL calculations to the Administrator of the Environmental Protection Agency ("EPA"). Within thirty days after this submission, the Administrator must take one of two actions. She may approve the TMDL, in which case it becomes binding on the states. If, however, she disapproves it, the Administrator must devise her own binding TMDL for the state within thirty days of disapproval. CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2).

More than eighteen years after its first TMDL submission was due, the District of Columbia had yet to forward a single TMDL calculation to the EPA. Arguing that nearly two decades of silence and inaction from the District constitute a "constructive submission" that no TMDLs are necessary, Plaintiffs Kingman Park Civic Association and other organizations and individuals have brought suit under the CWA's citizen-suit provision, CWA § 505(a)(2), 33 U.S.C. § 1365(a)(2), to compel the Administrator to disapprove the District's "submissions," and to order the Administrator to establish TMDLs for the District's polluted waters. In moving to dismiss the Plaintiffs' Amended Complaint, EPA presents a narrow issue: whether the District's eighteen-year recalcitrance constitutes a submission that triggers the Administrator's nondiscretionary duty under

§ 303(d)(2). After careful consideration, the Court holds that a state's consistent, longstanding failure to submit TMDL calculations can be construed as a submission that calls forth the Administrator's nondiscretionary duties under § 303(d)(2).

## I.  BACKGROUND

With its passage, the CWA "marked the ascendancy of water-quality control to the status of a major national priority," *Monongahela Power Co. v. Marsh*, 809 F.2d 41, 45–46 (D.C.Cir.1987). Its intricate structure and rich history have received exhaustive attention from many federal courts during the past quarter century, and need not be revisited here. *See, e.g., Arkansas v. Oklahoma*, 503 U.S. 91, 104–07, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992); *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 116–21, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977); *Environmental Protection Agency v. California ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 202–09, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976); *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 287–98 (D.C.Cir.1981). Only the CWA's specific provisions at issue in this litigation require brief explication.

The CWA employs a variety of interrelated procedures to regulate water pollution. Among these, the National Pollutant Discharge Elimination System ("NPDES"), 33 U.S.C. § 1342, represents the CWA's primary mechanism for achieving and enforcing water-quality standards. Reduced to its essence, this regime prohibits discharges of pollutants from any "point source"—a discernable, confined, and discrete conveyance from which pollutants may be discharged—into the waters of the United States except as provided in an NPDES permit. *See id.* §§ 1311(a), 1362(12), (14).

Congress recognized, however, that the technology-based effluent limitations alone would fail to implement applicable water-quality standards. To supplement these

limitations, Section 303(d) of the CWA establishes "a complex statutory scheme," of which there are two important components. *EDF*, 657 F.2d at 294. First, each state, including the District of Columbia, must identify waters where point source controls pursuant to the NPDES permitting system alone will be insufficient to meet proper water-quality standards applicable to those waters. *See* CWA § 303(d)(1)(A), 33 U.S.C. § 1313(d)(1)(A). These waters, known as "water quality limited segments," or simply "WQLSs," are then submitted to EPA for approved. WQLS submissions, popularly known as "303(d) lists," not only identify each WQLS, but also describe the specific pollutants affecting the water and rank each WQLS in order of priority. Since 1992, EPA has required each state to submit an updated "303(d)" list every two years. *See* 40 C.F.R. § 130.7(d)(1).

For each WQLS identified in the 303(d) list, a state must establish a Total Maximum Daily Loads ("TMDLs") consistent with the priority ranking set forth in the 303(d) list. TMDLs "set the maximum amount of a pollutant which can be contributed into a stream segment without causing a violation of the water quality standards." *EDF*, 657 F.2d at 294. By statute and regulation, the TMDL calculation must "be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." CWA § 303(d)(1)(C), 33 U.S.C. § 1313(d)(1)(C); *see also* 40 C.F.R. § 130.7(c)(1)(ii).

So important is Section 303(d) to the CWA's overall structure that Congress compelled both the states and EPA to abide by strict, date-certain deadlines for submitting and implementing TMDLs.

Within 180 days from the date that EPA first identified certain pollutants, *see* CWA § 304, 33 U.S.C. § 1314, each state was bound by statute to submit its WQLSs and corresponding TMDLs. Once each state submitted these TMDL calculations, the statute obliged EPA either to approve or to disapprove the TMDL. If approved, the TMDL is incorporated into the state's water-quality management plans under Section 303(e). In the event that EPA disapproves the state's TMDL submission, however, the agency inherits a nondiscretionary duty to establish acceptable TMDL calculations within thirty days from the date of disapproval; the EPA's TMDL is then incorporated into the state's Section 303(e) plan. *See* CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2).

Because EPA neglected to promulgate its list of identified pollutants until December 28, 1978, 43 Fed.Reg. 60662 (1978), "the states' duty to submit TMDL calculations ... did not arise until June 28, 1979," *EDF*, 657 F.2d at 295; *see also* CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2).[1] From 1979 until 1994, the District of Columbia's response to its Section 303(d) obligations was absolute silence and intransigence. During that fifteen-year span, the District failed to submit a list of WQLSs, much less a single TMDL calculation. Not until 1994 did the District finally comply with its statutory duty under the CWA to submit a 303(d) list of WQLSs. It has since updated its list every two years as required by EPA regulations, albeit late each time. Yet, notwithstanding this modest and belated compliance, the District continued to ignore its TMDL obligations. More than 18 years after the District's duty to submit its first TMDL calculation ripened, it had not yet offered any TMDL to EPA for review. Not until January 1998—four months after Plaintiffs served their notice of intent to file this lawsuit—did the District submit a TMDL for Hick-

---

1. Congress directed EPA to identify and publish these pollutants by October 18, 1973, one year from the date that the CWA was enacted. *See* CWA § 304(a)(2)(D), 33 U.S.C. § 1314(a)(2)(D). Not until Judge John Sirica of this Court ordered EPA to delay no further did the agency publish its identifications on December 28, 1978.

ey Run, one of its 38 identified WQLSs. EPA subsequently informed the District that its Hickey Run TMDL was inadequate.

While the District has neglected its obligations under Section 303(d) for almost two decades, its waters have grown increasingly polluted. Today, sewage discharges into District waters contain unsafe levels of fecal coliform bacteria. In some cases, this fecal coliform bacteria exist in levels a thousand times greater than the maximum safe-level for swimming. *See* District of Columbia Consumer and Regulatory Affairs, Environmental Regulation Admin., *The District of Columbia Water Quality Assessment* at 211 (1996) [hereinafter *Water Quality Assessment* ] (Pls.' Exs. C & E). Beyond fecal coliform, District waters boast unhealthy amounts of toxics, organic compounds, pathogens, bacteria, metals, nutrients, and oil and grease to name a few. Toxic pollutants have accumulated in sediments, are ingested by fish, and are ultimately ingested by District residents, who may, according to some studies, face an increased risk of cancer. *See* D. Velinsky & J. Cummins, *Distribution of Chemical Contaminants in Wild Fish Species in Washington, D.C.*, ICPRB Rep. No. 94–1 (June 1994), at 62–67 (Pls.' Ex. D) *D.C. Commissioner of Public Health Urges Limited Consumption of Fish Caught in D.C. Waters*, D.C.

Gov't News Release, Nov. 15, 1994 (Pls.' Ex. E); *Water Quality Standards, supra,* at 202–09. Recently, the Anacostia River has been bestowed with the dubious distinction of being one of the ten most polluted rivers in the country. *See id.* at 85.[2]

Plaintiffs filed this lawsuit under the CWA's citizen-suit provision, § 505(a)(2), 33 U.S.C. § 1365(a)(2), and the Administrative Procedure Act, § 10(e), 5 U.S.C. § 706(1)-(2), to compel the EPA to establish TMDLs for the District's WQLSs. EPA has moved to dismiss, maintaining that neither the CWA nor the APA affords the Plaintiffs a mechanism to compel the agency to take action at this time.[3]

## II. DISCUSSION

A. *Subject-matter jurisdiction is proper to compel EPA to perform a nondiscretionary duty under the CWA.*

The citizen-suit provision of the CWA allows private individuals to sue EPA in federal district court "where there is alleged a failure of the Administrator [of EPA] to perform any act or duty under [the CWA] which is not discretionary with the Administrator." CWA § 505(a)(2), 33 U.S.C. § 1365(a)(2). Plaintiffs allege that EPA has failed to discharge its mandatory duty under Section 303(d)(2)[4] of the CWA

---

2. In its Reply Memorandum in Support of its Motion to Dismiss, EPA maintains that "District waters are not unprotected in the absence of TMDLs...," and that "it is not factually true that EPA and the District have been inactive in working to improve the District's waters." Def.'s Reply Mem. Further Supp. Mot. Dismiss at 23 n. 16, EPA is correct in asserting that the CWA contemplates TMDL monitoring as a supplement to other means of achieving water-quality standards and technology-based regulations. *See id.* This supplementary function, however, neither diminishes the importance of TMDLs, nor indicates that the District has managed to realize high, or even passable, standards of water quality without TMDLs.

3. After EPA filed its Motion to Dismiss, the parties agreed to dismiss voluntarily Counts I–III. Only Counts IV–V, therefore, are at issue.

4. Section 303(d)(2) provides, in pertinent part:

The Administrator shall either approve or disapprove such identification and load not later than thirty days after the day of submission. If the Administrator approves such identification and load, such State shall incorporate them into its current plan under subsection (e) of this section. If the Administrator disapproved such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon such identification and estab-

to prescribe TMDL calculations for the District of Columbia. EPA, to be sure, acknowledges that Section 303(d)(2) imposes a nondiscretionary duty on the agency to approve or disapprove a state's TMDL submissions, and if disapproving, to establish TMDLs for the state. It emphasizes, however, that only an actual "submission" of TMDL data triggers its nondiscretionary duty. By its own account, EPA has a nondiscretionary duty, to impose TMDL limits on states who bother to *submit* incomplete or inadequate TMDL data, but the agency inherits no similar imperative if a state simply opts never to tender a TMDL report.

Like the majority of courts that have confronted this quandary, this Court holds that "if a state fails over a long period of time to submit proposed TMDL's, this prolonged failure may amount to the 'constructive submission' by that state of no TMDL's." *Scott v. City of Hammond*, 741 F.2d 992, 996 (7th Cir.1984); *accord American Canoe Ass'n, Inc. v. United States Envtl. Protection Agency*, 30 F.Supp.2d 908, 919–22 (E.D.Va.1998) ("In the final analysis, the most compelling reason to follow *Scott* and its progeny is that EPA's alternative interpretation of the statute would allow recalcitrant states to short-circuit the Clean Water Act and render it a dead letter."); *Alaska Ctr. for the Env't v. Reilly*, 762 F.Supp. 1422, 1426–29 (W.D.Wa.1991) ("Congress intended that EPA's affirmative duties be triggered upon a state's failure to submit a list or any TMDL at all."); *cf. Miccosukee Tribe of Indians v. United States Envtl. Protection Agency*, 105 F.3d 599, 602–03 (11th Cir.1997) (holding that, despite the lack of an actual submission from Florida indicating that it had changed the water-quality standards, EPA's nondiscretionary duty under 33 U.S.C. § 1313(d)(4)(B) would be triggered if Florida had actually altered its water-quality standards). EPA maintains

that to find a nondiscretionary duty here is to ignore this Circuit's decision in *Sierra Club v. Thomas*, 828 F.2d 783, 790–92 (D.C.Cir.1987). There, the court held: "In order to impose a clear-cut nondiscretionary duty, we believe hat a duty of timeliness must 'categorically mandate' that all specified action be taken by a date-certain deadline." *Id.* at 791 (brackets omitted). Twice, however, the Circuit explained that "such deadline may exist, even though not explicitly set forth in the statute, if it is readily-ascertainable by reference to a *fixed* date or *event.*" *Id.* at 791 n. 58 (emphasis added); *accord id.* at 790 ("[A] nondiscretionary duty of timeliness may arise even if a deadline is not explicitly set forth in the statute, if it is readily-ascertainable by reference to some other fixed date or event."). Purporting to apply *Sierra Club*, EPA suggests that because the statute establishes no clear-cut, date-certain deadline that explicitly addresses state inaction, no nondiscretionary duty arises.

■ Refracted through the prism of EPA's analysis, *Sierra Club* and its application to this case assume distorted dimensions. On one level, EPA is correct: The CWA does not compel the agency to act by an explicit date if states fail to propose their own TMDL limits by a certain date. But that is not the question before the Court. Rather, the more appropriate inquiry here is whether a state that has failed to submit a single TMDL in over eighteen years can be deemed to have "submitted" a finding that no TMDLs are necessary. For if such historic, longstanding recalcitrance is tantamount to a *submission*, then there is no question that EPA has a nondiscretionary duty. In that case, the submission would constitute a "fixed event" to which EPA must respond by either approving or disapproving the submission within thirty days.

CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2).

lishment the State shall incorporate them into its current plan under subsection (e) of this section.

Nor is this result dictated by "reason of an inference drawn from the overall statutory framework." *Sierra Club*, 828 F.2d at 791; *see also Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 710–11 (D.C.Cir.1974). It is predicated instead on statutory interpretation which leads ineluctably to the conclusion that state intransigence eventually becomes so entrenched as to be a final determination that no TMDL limits are necessary. In analogous contexts, this Circuit has rejected agency claims that decisions are not final for want of a formal decision. "[W]hen administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C.Cir. 1970). Similarly, a state cannot immunize itself from the CWA's important TMDL provisions through the simple expedient of refusing to submit TMDL calculations to EPA.

In construing a related subdivision of Section 303(d), the Eleventh Circuit reached just such a result. *See Miccosukee Tribe*, 105 F.3d at 602. Pursuant to Section 303(c)(2)(A), states are required to submit new or revised water-quality standards to EPA, which, in turn, is required either to approve or to disapprove those new standards. Arguing that a Florida statute changed the state's water-quality standards, Plaintiffs filed a citizen-suit under the CWA to compel EPA to review the putatively new standards. EPA moved to dismiss for lack of subject-matter jurisdiction, maintaining that the agency had no nondiscretionary duty because Florida had never submitted its new standards for review. Rejecting EPA's jurisdictional arguments, the Eleventh Circuit held that "Florida's failure to submit any new or revised standards cannot circumvent the purposes of the CWA. Even if a state fails to submit new or revised standards, a change in state water quality standards

could invoke the mandatory duty imposed on the Administrator to review new or revised standards." *Id.* at 602.

Although construing a different provision of the CWA, *Miccosukee Tribe* articulates a principle that transcends that case: Where a state has made a decision that would otherwise trigger EPA review, the state may not evade such review by simply refusing to reduce its decision to a formal submission. Here, as in *Miccosukee Tribe*, the District's failure to tender an actual "submission" to EPA is not dispositive. An eighteen-year failure to calculate and submit TMDLs constitutes a constructive—if not outright—determination that no TMDLs are necessary. Accordingly, the District may not so easily undermine one of the lynchpin mechanisms of the CWA. At bottom, as the Seventh Circuit has held:

> We think it unlikely that an important aspect of the federal scheme of water pollution control could be frustrated by the refusal of states to act. This is especially true in light of the short time limits both on a state's action, and on the EPA's required reaction to the state submissions, with respect to promulgation of the TMDL's.

*Scott*, 741 F.2d at 997.

To interpret "submission" in the excessively literal manner that EPA advocates is entirely unreasonable. Although EPA's briefs are long on literalism, they are conspicuously short on reconciling their interpretation with the structure of the CWA and Congress's intent. As EPA acknowledges, by enacting Section 303(d)(2), Congress has already made the policy choice of depriving the agency of all discretion over when it must approve or disapprove a state's TMDL submission. In light of this choice, it is implausible that Congress would wish to preserve EPA's discretion over establishing TMDLs when a state has essentially decided that no TMDLs are necessary. With Section 303(d)(2), Congress already has "accord[ed] a particular

agency action such high priority as to impose upon the agency a 'categorical mandate' that deprives it of all discretion over the timing of its work." *Sierra Club*, 828 F.2d at 791 (quoting *NRDC v. Train*, 510 F.2d at 712) (brackets and citation omitted). Why Congress would wish to liberate EPA from this categorical mandate when a state has consistently failed to implement a core component of the CWA for the past eighteen years is puzzling to say the least. *See American Canoe Ass'n*, 30 F.Supp.2d at 921 ("It seems highly likely that Congress intended that EPA should be required to act not only when states promulgate lists that fail to meet the standards set forth in § 303, but also when states completely ignore their mandatory statutory responsibilities and fail to promulgate and list at all.").

Indeed, to a large extent it was state intransigence that animated Congress to enact the Federal Water Pollution Control Act Amendments in 1972 in the first place. Although 1965 legislation required the states to develop water-quality standards for interstate waters within their boundaries, Congress lamented in 1971 that "[m]ore than 4 years after the deadline for submission of standards, only a little more than half of the States have fully approved standards." S. REP. NO. 92–414, at 4 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3671. Moreover, the legislative history suggests that Congress did envision a limited time frame for achieving its goal of high water quality when it enacted these provisions. In their Report to the Senate, the Committee on Public Works demonstrates Congress's intent to pursue the major alterations in water quality which the Act contemplated within a limited period of time, one far smaller than that in which the District of Columbia neglected to offer its TMDLs. The Senate Report enumerates its goals with an optimism that appears, in hindsight, somewhat idealistic:

The Committee believes the restoration of the natural chemical, physical, and biological integrity of the Nation's waters is essential. To achieve this objective, the Committee recommends that the following be adopted as national policy:—The discharge of pollutants into the navigable waters be eliminated by 1985;—An interim goal of water quality be achieved by 1981 to provide for the protection and propagation of fish, shellfish, and wildlife, and for recreation in and on the water.

. . . .

*Id.* at 3674. If in enacting its Amendments to the Federal Water Pollution Control Act, Congress intended that, as a matter of national policy, water pollutants be *eliminated* by 1985, then it strains credulity to posit that Congress meant for the EPA to stand passively aside for more than a decade after that while states flagrantly violated their statutory mandates.

Therefore, the Court denies EPA's Motion to Dismiss.

B. *Plaintiffs have stated a claim with respect to the Hickey Run TMDL*

Count IV of the Complaint avers that in January, 1998, the District at long last made a TMDL submission for a body of water known as Hickey Run. It further alleges that upon reviewing the TMDL, EPA disapproved it. Based on these facts, which the Court is obliged to accept as true for purposes of a motion to dismiss, *see Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1102 (D.C.Cir.1985),[5] the Plaintiffs have clearly established jurisdiction under the citizen-suit provision of the CWA.

EPA concedes that where a state has submitted a TMDL, and where the agency has disapproved it, EPA inherits a nondiscretionary duty to prescribe its own TMDL calculations for that body of water.

5. Furthermore, EPA has expressly indicated that, for the limited purpose of adjudicating

its Motion to Dismiss, it accepts the truth of all of the Plaintiffs' factual allegations.

All that animates EPA's motion to dismiss with respect to the Hickey Run TMDL is a formalistic objection to the syntax of the Plaintiffs' Amended Complaint. Based on EPA's disapproval of the Hickey Run TMDL, Plaintiffs alleged in their Amended Complaint that EPA had a nondiscretionary duty to prepare TMDLs for *all* WQLSs in the District.[6] EPA parsimoniously reads this phrase to mean that the Plaintiffs seek TMDLs for all waters and nothing less. Thus, by EPA's stringent pleading standards, a prayer for relief extending to all waters does not encompass a more particularized prayer for relief limited to just one body of water. At this stage in the litigation, however, "[t]he complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States*, 617 F.2d 605, 608 (D.C.Cir.1979). Accordingly, Plaintiffs may properly maintain a citizen suit under Section 505(a)(2) of the CWA to compel EPA to perform its nondiscretionary duty to prescribe a TMDL for Hickey Run.

## C. *Disapproval of one TMDL does not obligate EPA to promulgate TMDLs for all WQLSs.*

█ Based on EPA's disapproval of the District's Hickey Run TMDL, Plaintiffs suggest that the agency now has a nondiscretionary duty to establish TMDLs for every WQLS in the District. Undergirding this argument is an interpretation of Section 303(d)(2) that erroneously presumes a particularized meaning of the word "such." The relevant portion of Section 303(d)(2) provides:

> If the Administrator [of EPA] disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines

necessary to implement the water quality standards applicable to such waters . . . .

CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2). According to the Plaintiffs, "[t]he phrase 'for such waters' refers back to the previous phrase 'such waters in such State' earlier in the same sentence. Thus, having disapproved a state's submission, EPA's duty is to establish TMDLs for waters 'in such State' as necessary to implement the water quality standards applicable to such waters." Pls.' Opp'n at 17.

Recently, however, this Circuit has recognized that the word "such" is amenable to generalized interpretations. *See North Broward Hosp. Dist. v. Shalala*, 172 F.3d 90, 95–96 (D.C.Cir.1999). To be sure, sometimes the word "such" serves a "particularizing" or "limiting" role that "refer[s] to the last antecedent." *Id.* at 95 (quoting *Black's Law Dictionary* 1432 (6th ed.1990)). Yet "such" may just as easily "be used simply to refer back to something previously mentioned but not 'particularized' . . . in helping the reader to identify concepts that have already been employed in a long or complicated piece of writing." *Id.* (internal quotations omitted). Here, there is little reason to ascribe to the word "such" in Section 303(d)(2) the particularizing function that the Plaintiffs advocate. It is by no means obvious that the Plaintiffs' interpretation represents the unambiguous intent of Congress. Indeed, within subsection (d)(2) alone, Congress employed the word "such" no fewer than twelve times to modify a variety of terms. Under these circumstances, it seems more likely that Congress used the word simply to "help[ ] the reader to identify concepts that have already been employed in a long or complicated piece of writing." *North Broward*, 172 F.3d at 95. Moreover, as EPA observes, the Plaintiffs' interpretation would spawn unreasonable or perplexing

---

6. The validity of this assertion is addressed in the next section of this Memorandum Opinion.

consequences. For example, what is EPA's obligation if it approves one TMDL but disapproves a TMDL for a different body of water? Having found the provision to be ambiguous, the Court has little difficulty finding that EPA's interpretation is "reasonable and consistent with the statutory scheme and legislative history." *Cleveland v. United States Nuclear Regulatory Comm'n,* 68 F.3d 1361, 1367 (D.C.Cir.1995); *see also Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (holding that if an agency's interpretation "represents a reasonable accommodation ..., we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned").

    D.   *Since jurisdiction is proper under the citizen-suit provision of the CWA, Plaintiffs' claims under the APA must be dismissed.*

■ Plaintiffs' Count V, which articulates several claims under Section 10(e) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702(1)-(2), must be dismissed because they are duplicative of the claims that have been validly asserted in Count IV under the citizen-suit provision of the CWA. It is well established that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts,* 487 U.S. 879, 903, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); *see also Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). Indeed, Section 10(c) of the APA expressly subjects to judicial review only agency action "for which there is no other adequate remedy in a court." APA § 10(c), 5 U.S.C. § 704. As many federal courts have held, "[t]he [CWA] provides an adequate remedy for plaintiff in the circumstances here .... [Thus,] preclusion of the APA remedy is proper." *Allegheny County Sanitary Auth. v. Unit-*ed States Envtl. Protection Agency, 732 F.2d 1167, 1177 (3d Cir.1984); *Oregon Natural Resources Council v. United States Forest Serv.,* 834 F.2d 842, 851 (9th Cir.1987) ("Where the plaintiffs may otherwise proceed under the citizen suit provision, they should not be allowed to bypass the explicit requirements of the [CWA] established by Congress through resort to ... the APA."); *American Canoe,* 30 F.Supp.2d at 922–23 ("Since claim 4 [under the citizen-suit provision of the CWA] survives, claim 5, pleading in the alternative that EPA's failure to act is an abuse of discretion reviewable under the Administrative Procedure Act, must be dismissed."). Accordingly, Count V shall be dismissed.

### III. CONCLUSION

For the foregoing reasons, EPA's Motion to Dismiss shall be denied with respect to Count IV and granted with respect to Count V.